UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Irwin and Margery Muskat</u>


        v.                          Civil No. 06-cv-30-JD
                                    Opinion No. 2008 DNH 073

<u>United States of America</u>


DECISION


Irwin and Margery Muskat brought suit seeking a refund of
income taxes they paid in 1998.  The Muskats contend that they
mistakenly characterized a $1,000,000 payment they received from
Manchester Acquisition Corporation ("MAC") as part of the sale of
the Muskats' business, Jac Pac Foods, Ltd., as ordinary income
when it was a payment for Irwin's personal goodwill and should
have been taxed at the long term capital gain rate.[1]  They
contend that as a result of the mistake, they overpaid their
income taxes in 1998 by $203,434 and seek a refund pursuant to 26
U.S.C. § 7422.  The United States asserts that the payment was
properly taxed as ordinary income.

A bench trial was held on January 23 and 24, 2008.  In his
opening statement at trial, the Muskats' counsel raised a new

_____

[1]MAC is a subsidiary of Corporate Brand Foods America, Inc.
("CBFA"), which was formed for the purpose of being the entity to
acquire Jac Pac.

claim that the Muskats were entitled to a refund of $26,792 from their 1998 taxes, which was assessed as a self employment tax. The United States objected that the variance doctrine precluded the Muskats' new claim.  The court directed the parties to file memoranda on that issue.  After the trial concluded, the Muskats filed a brief on their claim for a refund of the self employment tax and moved for leave to amend their complaint to add the new claim.  The United States also filed a brief on the new claim and filed an objection to the motion for leave to amend.

I.  New Claim for a Refund of Self Employment Tax

     In their complaint, the Muskats pled a claim for a tax refund of $203,434 of the taxes they paid in 1998 on the theory that the $1,000,000 paid by MAC to Irwin Muskat, under the provisions of his noncompetition agreement, was actually a payment for the sale of Irwin's personal goodwill.  As a payment for goodwill, the Muskats alleged, the $1,000,000 should have been taxed as a long term capital gain.  Although not explained in the complaint, the $203,434 amount sought as a refund was comprised of $176,652 paid as ordinary income tax, allegedly in excess of the amount that would have been owed for long term capital gain tax, and $26,782 in self employment tax, paid

2

because the $1,000,000 was treated as ordinary income subject to self employment tax.

The Muskats' new claim is that they are entitled to a refund of $21,479 of the self employment tax paid in 1998 because compliance with a noncompetition agreement is not carrying on a trade or business as is required for self employment.[2]  See 26 U.S.C. §§ 1401 & 1402.  As a result, they contend, they should not have paid self employment tax on the $1,000,000 even if that payment is assessed as ordinary income.

Although the Muskats sought a refund of the 1998 self employment tax in their complaint, they did not assert the new theory that a payment made under a noncompetition agreement is not subject to self employment tax.  The United States contends that the Muskats are barred under the "variance doctrine" from bringing the new claim because they did not raise it in their administrative refund claim or in the complaint filed here.  The Muskats seek leave to amend their complaint, after trial, to include their new claim, and the government objects.

---

[2]The Muskats originally sought a refund of $26,782 for the self employment tax paid, but now agree with the government that the amount they claim should be $21,479.

A.  <u>Variance Doctrine</u>

By statute, a taxpayer is prohibited from bringing suit to recover a tax refund or a credit "until a claim for refund or credit has been duly filed with the Secretary, according to the provision of law in that regard, and the regulations of the Secretary established in pursuance thereof."  26 U.S.C. § 7422(a).  That provision requires administrative exhaustion, which limits the jurisdiction of the district courts over civil tax suits, as provided in 28 U.S.C. § 1346(a)(1).  <u>United States v. Williams</u>, 514 U.S. 527, 533 (1995); <u>United States v. Dalm</u>, 494 U.S. 596, 601 (1990).  Exhaustion, in this context, is defined by the variance doctrine that prohibits a taxpayer from raising claims in a suit for a tax refund that were not presented to the IRS in the administrative proceeding.  <u>IA 80 Group, Inc. & Subsidiaries v. United States</u>, 347 F.3d 1067, 1074 (8th Cir. 2004); <u>accord</u> <u>Western Co. of N. Am. v. United States</u>, 323 F.3d 1024, 1034 (Fed. Cir. 2003); <u>Appollo Fuel Oil v. United States</u>, 195 F.3d 74, 77 (2d Cir. 1999); <u>McDonnell v. United States</u>, 180 F.3d 721, 722 (6th Cir. 1999).

A prohibited variance occurs when the taxpayer raises "a ground for refund neither specifically raised by, nor included within the general language of, a timely claim for refund."  <u>IA 80 Group</u>, 347 F.3d at 1074.  The taxpayer cannot "substantially

4

vary the legal theories and factual bases set forth in the tax
refund claim presented to the IRS." <u>Lockheed Martin Corp. v.
United States</u>, 210 F.3d 1366, 1371 (Fed. Cir. 2000).  An IRS
"claim is sufficiently specific if the basic issue is evident
from the record, and the IRS is aware of the nature of the
claim." <u>IA 80 Group</u>, 347 F.3d at 1074.

In this case, the Muskats filed an amended 1998 return,
which served as their refund claim to the IRS.  The Muskats
explained the changes in their 1998 return as follows:
"Taxpayers are amending their tax return to properly record the
allocation between the sale of goodwill and a covenant not to
compete.  This change results in the reclassification of income
erroneously reported as fully ordinary income to the correct
allocation between ordinary income and capital gain."  Doc. 56,
Ex. 1.  The Muskats did not raise the new theory that the
$1,000,000, as payment under a noncompetition agreement, was not
subject to self employment tax in their IRS refund claim or in
their complaint filed in this court.

The Muskats argue that the variance doctrine does not bar
their new claim because they sought a refund of the self
employment tax in the claim presented to the IRS, albeit under a
different theory.  They contend that the IRS had notice of their
new self employment tax theory because they raised that theory in

their IRS claims for taxes paid in 2001 and 2002 and in a refund claim for 1999 to 2001.  They also contend that the United States has conceded in their other proceedings for tax refunds that payments under the noncompetition agreement are not subject to self employment tax.

The Muskats did not raise the new self employment tax theory in their 1998 tax refund claim before the IRS, which divests the court of jurisdiction to hear the claim.  Even if the IRS were deemed to have had sufficient notice of the new theory based on the Muskats' claims for refunds for other years, which is unlikely, that claim was not pled in the Muskats' complaint in this case.  To remedy that omission, the Muskats alternatively move to amend their complaint to add the claim.

     B.  <u>Motion for Leave to Amend the Complaint</u>

The Muskats seek leave to amend their complaint under Federal Rule of Civil Procedure 15(b), contending that an amendment to add the new theory to support their refund claim for the self employment tax paid in 1998 is necessary to conform the pleadings to the evidence and the issues at trial.  The United States objects to the motion.

"Rule 15(b) permits post-trial amendments to conform the pleadings to the evidence '[w]hen issues not raised by the

pleadings are tried by express or implied consent of the
parties.'"  <u>Kenda Corp. v. Pot O'Gold Money Leagues, Inc.</u>, 329
F.3d 216, 232 (1st Cir. 2003) (quoting Fed. R. Civ. P. 15(b)).
When the opposing party does not expressly consent to trial of an
issue, "[c]onsent to the trial of an issue may be implied if,
during the trial, a party acquiesces in the introduction of
evidence which is relevant only to that issue."  <u>Id.</u> (internal
quotation marks omitted).  An amendment under Rule 15(b) may be
allowed only when the opposing party will not be prejudiced.
<u>United States v. Davis</u>, 261 F.3d 1, 59 (1st Cir. 2001).

The United States did not expressly consent to trial of the
self employment tax issue.  The Muskats ignore the showing
required to show that the United States impliedly consented to
trial of the new self employment tax issue.  Instead, the Muskats
focus exclusively on showing that the United States would not be
prejudiced by introducing the new claim at this late date.

Absent at least implied consent, however, Rule 15(b) does
not apply.  The United States objected to the new issue at trial.
No evidence was introduced that was relevant only to that issue.
Therefore, the United States did not consent to trial of the
issue by implication.  The motion for leave to amend is denied.

II.  <u>Decision</u>

The Muskats sought a refund of income tax they paid for 1998 on the $1,000,000 payment under the Noncompetition Agreement, arguing that the payment was for Irwin Muskat's personal goodwill and should have been taxed as a long term capital gain rather than ordinary income.  The government opposed the refund.  The court denied the government's motion for summary judgment based on 26 U.S.C. § 1060 and, before trial, ruled that the applicable legal standard, as established by First Circuit precedent, was the "strong proof" rule.  <u>See</u> Order, July 25, 2007 (denying summary judgment); Order, Jan. 10, 2008 (deciding applicable standard).

During the bench trial held on January 23 and 24, 2008, Irwin Muskat, George Gillett, and Leslie Charm testified as witnesses.  The deposition of Benjamin Warren was submitted, with certain testimony stricken based on the parties' objections.  At the conclusion of the trial, the court gave the parties an opportunity to file trial briefs on or before March 20.

A.  <u>Findings of Fact</u>

Jac Pac Foods, Ltd. was founded in 1933, as Granite State Packing Company, by Irwin Muskat's grandfather.  Irwin Muskat

8

worked in all aspects of the family business, beginning when he was a teenager.  Granite State, based in Manchester, New Hampshire, bought another meat company, Jac Pac, based in Watertown, Massachusetts, in the 1960s, and their business grew significantly.  Muskat cultivated personal relationships with Jac Pac's customers and suppliers.

In 1987, when his uncle died, Muskat took over operational control of the company, becoming the president, CEO, and a 37% shareholder.  Muskat continued his "hands on" management style, maintaining his involvement in key accounts and his personal relationships with customers and suppliers.  After a fire at the Granite State site, the Jac Pac operation was moved from Watertown to a new facility in Manchester.  By 1998, Jac Pac had annual revenues of approximately $130,000,000.

During the late 1990s, Muskat earned $535,000 in salary and bonuses at Jac Pac.  He also had life insurance worth $4 million, partially paid for by Jac Pac.  In addition, Muskat had a deferred compensation plan that would provide him $200,000 per year for ten years, which would be paid to his heirs in the event of his death.

Irwin Muskat turned sixty in 1997 and began to consider whether he wanted to continue working the long hours that he had committed to Jac Pac.  During that time, a large hamburger

producing company was driven into bankruptcy by the effects of an e. coli outbreak caused by its products.  That event was the turning point in Muskat's decision to sell Jac Pac.

George Gillett, the chairman and majority stockholder of CBFA, contacted Muskat about purchasing Jac Pac.  CBFA was in the process of acquiring the assets of meat production and distribution companies to build a larger company with the intention of becoming an attractive acquisition for another enterprise or to take the company public.  Gillett and CBFA valued Muskat's relationships with customers, such as Wendy's, Burger King, Sisco, and Subway, and his relationships with suppliers and distributors, all of which had contributed to Jac Pac's success.  Gillett considered Muskat's relationships with his customers and suppliers to be extraordinary and would not have acquired Jac Pac without Muskat's continued participation in the business.

During the process that led to the sale of Jac Pac to MAC/CBFA, Jac Pac and Muskat were represented by Leslie Charm, a member of Jac Pac's board of advisors; Peter Leberman, an attorney; David Linton, an investment banker; and Muskat.  CBFA was represented by Gillett; Benjamin Warren, CBFA's president, CEO, and a minority shareholder; Jeffery Joyce; Jim McCoy, and

the law firm of Winston & Strawn, LLP.  Negotiations about the
sale went on during the summer and fall of 1997.

In early November of 1997, Muskat, Jac Pac's
representatives, and MAC/CBFA's representatives met in Chicago to
negotiate the terms of the transaction.  They discussed the
purchase price, the structure of the sale, Jac Pac's payment of
dividends, an incentive stock option plan, the consideration to
be paid to Irwin Muskat, and Muskat's role in the business after
it was sold.  Muskat wanted to receive more compensation in the
transaction than his share of stock in Jac Pac would provide.
Muskat's personal goodwill was not raised at the meeting.  The
Chicago meeting concluded without an agreement, and the parties
continued to negotiate the terms of the transaction.  Following
the meeting, letters indicated that the transaction would be
accomplished through a sale of assets with a purchase price of
$34 million.

Gillett and MAC/CBFA offered Muskat, personally, $2,500,000
to be paid in three equal installments, with the allocation to be
worked out in a manner that was advantageous to Muskat for tax
purposes.  In late December of 1997, Gillett and MAC/CBFA sent a
draft letter of intent that allocated the payments to a
noncompetition agreement and structured the payments in different
installments.  Muskat responded with changed language, adding,

among other things, a provision that the payments would survive
Muskat's death or disability.  On January 8, 1998, CBFA and
Muskat agreed to a letter of intent that included the
noncompetition agreement, with a survivability provision, and
also required Muskat to make an investment in CBFA and to enter a
three-year employment agreement with CBFA.

Gillett testified that in his business transactions he
preferred to operate in partnership with the owners of the
acquired businesses and to provide incentives of stock options,
bonuses, and deferred compensation to keep the executives in the
business.  He also testified that the negative incentive of a
noncompetition agreement was necessary to protect against
problems that might arise later if the relationships and positive
incentives did not work out.  Jac Pac's advisor, Leslie Charm,
remembered that Gillett and Warren required a noncompetition
agreement.

During January and February of 1998, the parties and their
representatives worked on drafts of the documents for the
transaction, which included the asset purchase agreement, the
noncompetition agreement, the employment agreement, and the
subscription agreement that required Muskat to invest in CBFA.
The noncompetition agreement was an essential element of the
transaction package.

12

Muskat became concerned that the nature of the transaction had changed so that he would not receive the compensation that he had been promised, and the deal nearly collapsed.  Muskat understood that he would receive a compensation package that had the same value as the compensation he was receiving from Jac Pac prior to the transaction with MAC/CBFA.  The parties agreed to allocate the purchase price differently so that Muskat would receive more from the transaction.  Warren and Gillett from MAC/CBFA felt that it was important to have Muskat continue in his role as CEO at Jac Pac and to use his relationships and contacts for the benefit of the combined companies.

New draft documents were prepared.  Muskat was offered an additional $2,000,000 in compensation under the noncompetition agreement.  The next draft of the agreements reduced the compensation under the noncompetition agreement, to reflect reduced payments in the years 1999, 2000, and 2001.  A subsequent draft reduced the compensation again by a small amount.

The asset purchase agreement was signed on March 31, 1998. That agreement allocated the asset purchase price to include $15,908,511 for Jac Pac's goodwill.  The agreement required Muskat and MAC/CBFA to execute a mutually satisfactory noncompetition agreement, employment agreement, and subscription agreement.  The noncompetition agreement and other agreements

13

were signed on May 7, 1998, as part of the Jac Pac transaction.
Under the subscription agreement, Muskat agreed to invest
$2,000,000 in CBFA.  Under the employment agreement, Muskat was
entitled to salary and also to bonuses that were tied to certain
sales targets.

> The noncompetition agreement provides that Muskat
>
> shall not . . . participate or engage in directly or
> indirectly (as an owner (other than as a passive
> investor), partner, employee, officer, director,
> independent contractor, consultant, advisor or in any
> other capacity calling for the rendition of services,
> advice, or acts of management, operation or control),
> any business that, during the Term, is competitive with
> the Business Conducted (as defined below) by the
> Company or any firm or corporation owned or controlled
> by CBFA (a "Related Entity") within any geographic area
> in which the Company or any Related Entity does
> business.

The "Term" of the agreement, which was defined in relation to
Muskat's employment agreement, extended for thirteen years.  The
agreement prohibited Muskat from soliciting employees to leave
the company and affiliate with a competitor and from diverting
business from the company.  In consideration for the agreement,
Muskat would be paid a total of $3,955,599 in separate
installments, beginning with a $1,000,000 payment on the date of
the agreement.  The agreement also provided that the obligation
of MAC/CBFA "to make the payments provided for herein shall
survive Muskat's death or disability."

14

Muskat has received the payments promised under the noncompetition agreement.  He also worked for CBFA as provided in the employment agreement and invested in the company as the subscription agreement required.  When CBFA was purchased by another company in 2000, Muskat continued his employment with the new company and worked until 2004.

On their 1998 federal tax return, Irwin and Margery Muskat identified the $1,000,000 dollar payment Irwin received under the noncompetition agreement as ordinary income and paid income tax and self employment tax on that amount.  The Muskats filed an amended tax return in 2002, characterizing the $1,000,000 payment in 1998 as proceeds from the sale of Irwin Muskat's personal goodwill in Jac Pac.  They claimed an overpayment of taxes for 1998 in the amount of $203,434.  The IRS denied their request for a refund.

B.  <u>Discussion and Rulings of Law</u>

The Muskats argue that despite the provisions of the noncompetition agreement, the payments under that agreement were intended by the parties to purchase Irwin Muskat's personal goodwill.  The Muskats claim that they are entitled to a tax refund because as compensation for goodwill, the payment should

15

have been taxed as a capital gain.  The government contends that
the Muskats are bound by the terms of the noncompetition
agreement and cannot now reconfigure the purpose of the agreement
for tax purposes.  The government asserts that no tax refund is
due because the payment was ordinary income and because even if
the payment related to Irwin Muskat's personal goodwill, he was
required to provide services to MAC/CBFA in connection with his
personal goodwill, making the payments ordinary income.

The parties disputed the applicable standard for deciding
whether the $1,000,000 payment under the noncompetition agreement
was for the purposes expressed in the agreement or was instead a
payment for Irwin's personal goodwill.  The Muskats argued that
the "economic reality test" applied.  The government contended
that the First Circuit required "strong proof" to overcome the
parties' expressed intent.  The court ruled, based on older but
still extant First Circuit precedent, that the "strong proof"
standard applied.  See Order, Jan. 10, 2008 (doc. no. 38).

1.  Noncompetition Agreement or Sale of Personal Goodwill

The noncompetition agreement provides that the consideration
paid is for Muskat's promises made under the agreement.  To
prevail on their personal goodwill claim, the Muskats must show
by "strong proof" that, despite the express terms of the

agreement, Irwin Muskat and MAC/CBFA intended the $1,000,000 payment to be compensation for Irwin's personal goodwill and not for the promises made in the noncompetition agreement.  <u>Harvey Radio Labs., Inc. v. Comm'r of Internal Revenue</u>, 470 F.2d 118, 119–20 (1st Cir. 1972).  The <u>Harvey Radio</u> standard requires strong proof of the parties' intentions when they entered into the noncompetition agreement.  <u>Id.</u> at 120.

The negotiation process that culminated in the sale of Jac Pac to MAC/CBFA did not include a discussion of Irwin Muskat's personal goodwill, as such.  Neither the noncompetition agreement nor any other agreement in the transaction mentions Irwin Muskat's personal goodwill.  Indeed, the concept of personal goodwill as an asset, separate from business goodwill and from the obligations imposed by the noncompetition agreement, in the context of the sale of a business like Jac Pac is unclear.  <u>See</u>, <u>e.g.</u>, <u>Matter of Prince</u>, 85 F.3d 314, 320–23 (7th Cir. 1996) (discussing value of orthodontist's goodwill in his practice for purposes of bankruptcy valuation and attributing orthodontist's goodwill, his relationships with patients, as an asset of his practice); <u>Bruss Co. v. K & S Brokerage, Inc.</u>, 1992 WL 25375 at *10 (N.D. Ill. 1992) (discussing personal goodwill of former sales contractor for purposes of determining whether nonsolicitation covenant was enforceable); <u>In re Cooley</u>, 87 B.R.

17

432, 443 (S.D. Tex. 1988) (goodwill of medical practice not separate from personal goodwill of physician and could not be sold separate from his services); Martin Ice Cream Co. v. C.I.R., 110 T.C. 189, 206-07 (1998) (where family member operated as principal of family business without an employment agreement or noncompetition agreement, his oral agreement with customer and personal relationships were his own asset and not an asset of the business).

During the negotiation process, the parties were well-aware of Jac Pac's business goodwill, to which more than $15,000,000 of the purchase price was allocated.  Warren testified that he was not aware of any goodwill in the transaction other than Jac Pac's goodwill.  The noncompetition agreement defines "Goodwill" as an asset of Jac Pac "including its goodwill and business as a going concern."  The purpose of the noncompetition agreement was to protect Jac Pac's "Goodwill" in the transaction.  Muskat acknowledged in the agreement that the noncompetition provisions were "necessary to preserve and protect the proprietary rights and the goodwill of [MAC] (including [Jac Pac's goodwill]) and the Related Entities as going concerns."  The consideration paid under the agreement was expressly for the covenants not to compete, with no mention of personal goodwill.

18

Muskat contends that the provisions of the noncompetition agreement, including the long term of the agreement and the survivability provision, were unusual and show that the agreement was really a sale of his personal goodwill.  He also contends that given his age, his lack of interest in competing with MAC/CBFA, his employment and investment in the company, and the insurmountable difficulties that would be encountered in starting a competing business, there was no need for a noncompetition agreement.  Because a noncompetition agreement was not necessary, Muskat contends the compensation under the agreement was instead paid for his personal goodwill.

The evidence shows that Gillett of MAC/CBFA included noncompetition agreements in nearly all of his business transactions because he believed that the protection such agreements provide is important.  He testified that he was pleased to have the noncompetition agreement with Muskat to protect his family's interests in the business, although the agreement was not the central focus of the transaction with Muskat and Jac Pac.  Although Gillett was not particularly concerned that Muskat would leave CBFA to start a competing business, he nevertheless intended that the noncompetition agreement with Muskat would protect CBFA shareholders and protect Gillett's family partnerships.

19

Gillett and Warren valued Muskat's key relationships with Jac Pac's customers, suppliers, and distributors and his keen business acumen.  They knew that Muskat wanted to be paid more than his stockholder share of the purchase price and that he wanted his package from MAC/CBFA to include the same value as his compensation package with Jac Pac.  They felt that retaining Muskat in the business was essential for the transaction, and they agreed to the increased amounts because it was necessary to have Muskat recommend the transaction to Jac Pac's board and the other shareholders.  Although the agreement accommodated Muskat's demand for additional compensation, MAC/CBFA did not pay more in the transaction but instead merely reallocated the purchase price.

The Muskats have persuasively shown that MAC/CBFA agreed to allocate additional compensation to Irwin through the noncompetition agreement.  They have not provided strong proof that MAC/CBFA and Muskat intended the payments under the noncompetition agreement to buy Muskat's personal goodwill. Therefore, the Muskats did not carry their burden of proof on their claim that the $1,000,000 payment made in 1998 under the noncompetition agreement was for the sale of Irwin Muskat's personal goodwill.

2.   <u>Sale of Asset or Payment for Personal Services</u>

The government also argues that if the payments under the
noncompetition agreement were found to be something other than
compensation for the covenants in that agreement, those payments
were for personal services and not for the sale of an asset.  The
Muskats' claim was that the compensation agreed to in the
noncompetition agreement was for the sale of an asset, Irwin's
personal goodwill.  The court has concluded that the Muskats did
not carry their burden of proof on that claim.  As that resolves
the only claim raised in the complaint, no further analysis is
necessary.

<u>Conclusion</u>

For the foregoing reasons, the plaintiffs' motion for leave
to amend their complaint (document no. 48) is denied.

The court finds in favor of the government on the
plaintiffs' only claim in this case that the $1,000,000 paid in
1998 under the noncompetition agreement was a payment for the
sale of Irwin Muskat's personal goodwill.

The clerk of court shall enter judgment in favor of the government and close the case.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

April 2, 2008

cc:  Nathaniel J. Dorfman, Esquire
     James E. Higgins, Esquire
     Robert J. Kovacev, Esquire
     Edward J. Murphy, Esquire
     T. David Plourde, Esquire
     John-Mark Turner, Esquire
     Karen Wozniak, Esquire